Slip Op. 13 - 139

UNITED STATES COURT OF INTERNATIONAL TRADE

```
┌─────────────────────────────────────┐
│ THAI PLASTIC BAGS INDUSTRIES         │
│ CO., LTD, ET. AL.,                   │
│                                      │
│            Plaintiffs,               │
│                                      │
│                 v.                   │
│                                      │
│ UNITED STATES,                       │
│                                      │
│            Defendant,                │
│                                      │
│                and                   │
│                                      │
│ POLYETHYLENE RETAIL CARRIER BAG      │
│ COMMITTEE, HILEX POLY CO., LLC,      │
│ and SUPERBAG CORPORATION,            │
│                                      │
│            Defendant-Intervenors.    │
└─────────────────────────────────────┘
```

Before: Donald C. Pogue,
        Chief Judge

Consol. Court No. 11-00408[1]

## OPINION

[affirming the Department of Commerce's remand re-determinations]

Dated: November 13, 2013

Irene H. Chen, Chen Law Group LLC, of Rockville, MD, and Mark B. Lehnardt, Lehnardt & Lehnardt, LLC, of Liberty, MO, for Thai Plastic Bags Industries, Co., Ltd.

Joseph W. Dorn and Daniel L. Schneiderman, King & Spalding LLP, of Washington, DC, for Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., LLC, and Superbag Corporation.

Ryan M. Majerus, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant. Also on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of

---

[1] This action was consolidated with Court No. 11-00409 and Court No. 11-00416.

counsel on the brief was <u>Scott D. McBride</u>, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.


**Pogue, Chief Judge:**  This case returns to court following remand to the Department of Commerce ("Commerce" or "the Department") by <u>Thai Plastic Bags Industries Co., Ltd. v. United States</u>, 37 CIT ____, 904 F. Supp. 2d 1326 (2013) ("<u>TPBI Remand Order</u>").[2]  The Department responded to the <u>TPBI Remand Order</u> by issuing its <u>Results of Remand Redetermination Pursuant to Court Remand</u>, A-549-821, ARP 09-10 (Jul. 10, 2013), ECF Nos. 87, 89 ("<u>Remand Results</u>").

The parties here raise two challenges to the Remand Results.  First, respondent Plaintiffs claim that Commerce improperly increased Thai Plastic Bags Industries Co., Ltd.'s ("TPBI") home market general and administrative ("G&A") expenses by failing to exclude from, or "offset," those expenses by the amount of revenue from the sale of certain assets.  Second, Defendant-Intervenors Polyethylene Retail Carrier Bag Committee, Hilex Poly Company, LLC, and Superbag Corporation (collectively the "Domestic Producers") claim that the Department has improperly reduced the surrogate selling expenses for respondent Landblue (Thailand) Co., Ltd. ("Landblue").  In the alternative,

---

[2] All citations to the TPBI Remand Order are to the Federal Supplement.

the Domestic Producers argue that the Department should, if
allowed to reduce Landblue's selling expenses, calculate a
profit amount derived from the same source (TPBI) rather than
the surrogate producer selected by the Department, Thantawan
Industry Public Company Limited ("Thantawan").

        For the reasons stated below, the Department's remand
determinations are affirmed.  Commerce's denial of an offset to
G&A expenses for revenue from the sale of land and buildings
properly applies a Department policy intended to increase the
accuracy of dumping margin calculations in a manner supported by
the record evidence presented.  The reduction of surrogate
selling expenses, which reflects the distinction between direct
and indirect costs, is neither beyond the discretion of the
Department nor unsupported by substantial evidence on the
record.  Finally, the Department was not obliged to seek
additional information from TPBI to calculate a profit amount
after it reasonably determined to use Thantawan as a surrogate
for Landblue.

**BACKGROUND**

A. Department of Commerce Determinations and the TPBI Remand
   Order

The TPBI Remand Order followed a review of the Department's determinations in <u>Polyethylene Retail Carrier Bags From Thailand</u>, 76 Fed. Reg. 59,999 (Dep't Commerce Sept. 28, 2011) (final results) ("<u>Final Results</u>") and accompanying Issues & Decision Mem., A-549-821, ARP 09-10 (Sept. 21, 2011) ("<u>I&D Memo</u>").  The <u>Final Results</u> calculated dumping margins for the two exporter/respondent companies under review, TPBI and Landblue.  In making these calculations, the Department exercised its authority under section 773(e)(2)(B) of the Tariff Act of 1930, 19 U.S.C. § 1677b(e)(2)(B)[3] to "construct" or estimate actual costs of a respondent's sales where valid comparison sales in the exporting country were not available.  See <u>Final Results</u> at 60000, 60001.  Both the Domestic Producers and the Plaintiff exporter/respondents challenged aspects of the Department's constructed value ("CV") calculations in a consolidated action here. <u>TPBI Remand Order</u>.  Of these challenges, the <u>TPBI Remand Order</u> identified two issues requiring additional consideration.

First, the Department had calculated a reduction in its estimates of TPBI's G&A expenses by "offsetting" or reducing those expenses by the amount of revenues from certain asset

---

[3] Further references to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, 2006 edition.

sales taking place during the period of review ("POR"). I&D Memo
at cmt. 1.  In doing this, the Department applied a general
policy allowing reductions for any gains made in the "routine
disposition of assets" in order to more accurately calculate the
dumping margin. Id.[4]  The TPBI Remand Order concluded that the
Department's grant to TPBI of an offset for revenue from the
sale of certain land and fixed assets, despite indicia that the

---

[4] In calculating the cost of production for purposes of
establishing a dumping margin, the Department is required by
19 U.S.C. § 1677b(b)(3)(B) to include "an amount for selling,
general, and administrative expense based on actual data
pertaining to production and sales [. . . ]."  In making this
calculation, the Department's regular practice is to offset
expenses by revenues from the sale of equipment or capital goods
so long as such sales are routine parts of the production
process. Remand Results at 3.  This practice recognizes that
"The gains or losses on the routine disposal or sale of assets
of this type relate to the general operations of the company as
a whole because they result from activities that occurred to
support on-going production operations." Certain Softwood Lumber
Products from Canada, 70 Fed. Reg. 73,437 (Dep't Commerce Dec.
12, 2005) (final results) and accompanying Issues & Decision
Mem., A-122-838 ("Softwood I&D Memo") at cmt. 8.
    In contrast, the Department interprets "pertaining to
production and sales" in 19 U.S.C. § 1677b(b)(3)(B) as properly
excluding costs that are not routine and recurring in the normal
course of production and sales. See id.  Reflecting this, the
Department has consistently made a distinction between routine
transactions relating to production and singular or "one off"
transactions.  These two types of transactions are distinguished
for the purpose of calculating revenue offsets to G&A expenses
based on an analysis of their "nature, significance, and the
relationship of that activity to the general operations of the
company." Remand Results, at 15 (quoting Certain Frozen Canned
Warmwater Shrimp from Brazil, 69 Fed. Reg. 76,910 (Dep't
Commerce Dec. 23, 2004) (final determination) and accompanying
Issues & Decision Memo, A-351-838 at cmt. 8.)

sale was not conducted in the routine course of business, was not adequately supported by evidence on the record. TPBI Remand Order at 1331.  The decision to provide an offset for these revenues was therefore remanded to the Department for further consideration.

Second, the Department calculated a normal or home market value for Landblue by approximating Landblue's selling expenses using Landblue's own ratio of direct to indirect selling expenses and applying that ratio to the selling expenses reported by Thantawan, a Thai surrogate company selected because, during the POR, it produced "similar merchandise, [had] a similar customer base, and operated with a profit."  I&D Memo at cmt. 5.[5]  The decision to apply the Landblue ratio to Thantawan's selling expenses represented an acknowledgement by the Department that Thantawan's reported selling expenses did not disaggregate direct expenses associated with export sales from indirect expenses that would apply to both domestic and export sales. Id.  Because Thatawan's expenses were not allocated or identified as direct and indirect, the Department determined that the accuracy of the CV calculated for Landblue would be greater if some correction were made for the over-inclusion of selling expenses in the surrogate's financial

---

[5] Landblue did not have any home market or third country sales. I&D Memo at 13.

statement.  Id.; Remand Results at 7.  To make this correction,

the Department applied Landblue's direct/indirect expense ratio

to Thantawan's reported selling expenses to generate the amount.

But the decision to use Landblue's own direct/indirect expense

ratio was based on assumptions about the similarity of the

expenses incurred by the two companies.

        The TPBI Remand Order found these assumptions to be

contradicted by facts on the record.  Specifically, the

Department did not address the fact that Landblue, with no

domestic sales at all, was likely to incur a different ratio of

direct and indirect selling expenses than a company selling

largely within its home market. TPBI Remand Order at 1334.  As a

result, it was not clear from the record evidence that applying

the Landblue ratio would serve the statutory purpose of making

as accurate a determination as possible.  This determination was

also therefore remanded to the Department for reconsideration.


B. Challenged Remand Results

        To address the two issues on remand, the Department

gathered additional information and revised its determinations

based on the resulting, more complete factual record.

        First, the Department's reconsideration of the revenue

offsets allowed for TPBI's sale of assets was based on answers

submitted by TPBI to a Department questionnaire intended to

better identify the type of sales that generated the contested

revenues. Remand Results at 4.  Based on its analysis of this

additional information, the Department determined that the

portion of revenues attributable to the sale of an office

building and associated land should not be classified as part of

the company's routine operations.  Instead, the Department found

that this was a singular sale of fixed assets generating non-

recurring gains.  This determination was based on both the

relative size of the transaction and the business circumstances

that surrounded the sale. Id. at 5-6.  Therefore the Department,

on remand, eliminated the deduction of that portion of TPBI's

gain from its calculation of its G&A expenses. Id. at 6.

        Second, Commerce addressed the remaining issue on

remand by opening the record to collect additional data from

both Landblue and TPBI regarding the breakdown of their direct

and indirect selling expenses.  Commerce then re-examined the

use of Thantawan as a surrogate for calculating Landblue's

selling expenses and reconsidered the application of a

direct/indirect ratio to Thantawan's reported selling expenses.

Remand Results, app. B at 2; id. app. A ("Analysis Memo") at 3;

id. at 13, 17.  Based on the additional data collected from

Landblue and TPBI, the Department a) affirmed its determination

that using Thantawan as a surrogate for Landblue's selling

expenses is justified, b) affirmed the determination that

applying some reduction to Thantawan's selling expenses is justified, and c) determined that the types of selling expenses incurred by Thantawan and TPBI were sufficiently similar to justify applying TPBI's direct/indirect selling expense ratio — rather than Landblue's - to the reported selling expenses in calculating a CV for Landblue.  Finally, the Department declined to re-open its determination of an appropriate profit figure for Landblue to use surrogate data rather than TPBI's proprietory information.

## STANDARD OF REVIEW

"The court will sustain the Department's determination upon remand if it complies with the court's remand order, is supported by substantial evidence on the record, and is otherwise in accordance with law." Jinan Yipin Corp. v. United States, __ CIT __, 637 F. Supp. 2d 1183, 1185 (2009) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

This standard precludes arbitrariness in the application of antidumping laws.  An agency decision is arbitrary, inter alia, if it applies different standards of judgment to similar cases without adequate explanation and factual support on the record. See Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996) ("an agency action is

arbitrary when the agency offered insufficient reasons for treating similar situations differently.")

**DISCUSSION**

A. <u>The Exclusion of Revenues From the Sale of Land in Calculating TPBI's G&A Expenses</u>

Based on the additional information gathered by the Department, revenue from TPBI's sale of a parcel of land and associated buildings have been appropriately excluded from gains incurred in the routine operation of business and therefore not used as the basis for an offset or deduction from TPBI's G&A expenses.[6]

TPBI argues that this analysis has not been properly conducted in classifying their reported sale of an office building and parcel of land. <u>Plaintiffs' Comments Concerning Commerce's Final Results of Redetermination</u>, ECF No. 92 at 5. Noting that in some prior determinations the Department has found that land sales are classified as routine expenses which are appropriately the basis for a G&A revenue offset, TPBI claims that the Department has determined that the land and building sales were significant and non-routine "without material analysis or discussion." <u>Id.</u> at 4-5.

---

[6] <u>See</u> <u>supra</u> note 4.

Despite Plaintiffs' claim, the analysis and evidence submitted with the Remand Results are sufficient to support the Department's classification of this transaction. See Analysis Memo at 2.  The Department distinguishes between the sale of capital equipment and the sale of an office building and associated land, reviews the criteria for considering such a sale to be outside the scope of routine business operations, and notes that the large scale of the revenues from the building transaction relative to the other transactions conducted during the same period make it "significant" as the term is used in this type of analysis. Id. at 2,3.[7]  The analysis conducted by the Department in the Analysis Memo is comparable to the analysis that determined the result cited by the Plaintiff in Polyethylene Terephthalate Film, Sheet, and Strip from the Republic of Korea, 75 Fed. Reg. 70,901 (Dep't of Commerce Nov. 19, 2010) (final results) and accompanying Issues & Decision Mem., A-580-807 at cmt. 3.  In both cases, the character of the transaction and its significance were evaluated – the former by its relationship to the company's line of business and the latter based on the revenue generated relative to other transactions.  The Department's classification is therefore

---

[7] See especially Table 1, emphasizing the scale of this transaction relative to other asset sales.

consistent with its established practice and supported by a

reasonable reading of the facts on the record.


    B. Application of TPBI's Ratio of Direct to Indirect Selling
       Expenses to Thantawan's Reported Selling Expenses

        As noted above, in response to this aspect of the TPBI

Remand Order, Commerce gathered additional information and made

three significant conclusions based on an evaluation of the

expanded record.  First, it affirmed its determination that

Thantawan represents an adequate surrogate for Landblue's

selling expenses. Remand Results at 11.  Second, it affirmed the

previous determination that the goal of calculating the most

accurate CV requires that Thantawan's financial statement of its

selling expense be modified to reflect the distinction between

direct and indirect expenses. Remand Results at 10, 19.  Third,

the Department determined that the similarity in market

positions between Thantawan and TPBI makes the use of TPBI's

ratio of direct to indirect selling expenses - rather than

Landblue's - the most accurate way of calculating a CV for

Landblue. Remand Results at 10.

        Of these determinations, the Domestic Producers object

to the second on the same grounds articulated in their initial

brief prior to the TPBI Remand Order.  See Reply Brief of the

Polyethylene Retail Carrier Bag Committee, et. al. in Support of

Their Motion for Judgment on the Agency Record, ECF Nos. 50, 51

("Domestic Producer's Brief") at 10-12.  Specifically, the

Domestic Producers argue that Commerce has had a consistent

practice since 2007 of never disaggregating line items on

financial statements because of the Department's concern that

doing so might introduce distortions rather than increase

accuracy. See Defendant-Intervenors' Comments Concerning

Commerce's Final Results of Redetermination Pursuant to Court

Remand, ECF No. 91 ("Domestic Producers' Comments") at 3.  If

such a practice exists, the court is obliged to ascertain

whether the determination in this case has been supported by

sufficient reasons for deviating from the practice and treating

similar situations differently.  See Transactive Corp. v. United

States, 91 F.3d 232, 237 (D.C. Cir. 1996).

        In support of their argument, the Domestic Producers

cite four prior antidumping determinations claimed to articulate

this general policy of never disaggregating line-items. See

Coated Free Sheet Paper from the People's Republic of China, 72

Fed. Reg. 60,632 (Dep't Commerce Oct. 25, 2007) (final

determination) and accompanying Issues & Decision Memorandum, A-

570-906 ("Free Sheet Paper") at cmts. 4, 5; Wooden Bedroom

Furniture from the People's Republic of China, 76 Fed. Reg.

49,729 (Dep't Commerce Aug. 11, 2011) (final results) and

accompanying Issues & Decision Mem., A-570-890 ("WBF 2011 I&D

Memo") at cmt. 19(A)(iv); Polyethylene Terephthalate Film,
Sheet, and Strip from the People's Republic of China, 77 Fed.
Reg. 14,493 (Dep't Commerce Mar. 12, 2012) (final results) and
accompanying Issues & Decision Mem., A-570-924 ("PET Film 2012")
at Issue 1[8] ; Certain Coated Paper Suitable for High Quality
Print Graphics Using Sheet-Fed Presses from the People's
Republic of China, 75 Fed. Reg. 59,217 (Dep't Commerce Sep. 27,
2010) (final determination) and accompanying Issues & Decision
Mem., A-570-958 ("Coated Paper") at cmt. 32.  In addition, the
Domestic Producers allege that this Court has acknowledged the
existence of Commerce's practice in Dongguan Sunrise Furniture
Co., Ltd. v. United States, 36 CIT ___, 865 F. Supp. 2d 1216,
1244 (2012).

        To determine whether such a policy exists and whether
the Department is engaged in arbitrary behavior by violating
that policy in this instance, it is necessary to examine the
Domestic Producers' claims in detail.  Conceding that Department
policy allowed it to disaggregate balance sheet line items in
2005, the Domestic Producers claim that the Department

---

[8] This determination, in which the Department rejects a
complex proposal to modify cost estimates for a company in one
country, based on the balance sheets of an affiliated producer
in another country, offers only indirect support for the
Domestic Producers' claim. Id. at Issue 1.

introduced a new policy in "late 2007" that precluded

disaggregating line items in a financial statement.[9]

        The first authority cited by the Domestic Producers to

support this claim is Free Sheet Paper at comments 4 and 5.

While the Department in this determination did refuse to

disaggregate a balance sheet line item, it neither established a

new policy on this question nor dismissed its prior practice of

balancing the chance of improving accuracy against the danger of

introducing distortion.  Instead, the Department expressed a

"preference" for using unmodified surrogate data,[10] justified its

_____

        [9] The Domestic producers concede that the Department's
policy as of 2005, when it decided Certain Hot-Rolled Carbon
Steel Flat Products from Romania, 70 Fed. Reg. 34,448 (Dep't
Commerce June 14, 2005) (final results) and accompanying Issues
& Decision Mem., A-485-806 ("HRS from Romania") at cmt. 7,
allowed it to do precisely what it has done in the Remand
Results – disaggregate a financial statement line items when
doing so is likely to result in greater accuracy. Domestic
Producers' Comments at 4.  The Domestic producers claim that
this policy was changed in late 2007 (presumably in the Free
Sheet Paper determination) to eliminate the practice or test of
balancing the likelihood of increasing accuracy against the
danger of introducing distortion.  Since 2007, according to the
Domestic Producers, the Department "does not evaluate the
'unique facts' of each case regarding whether an adjustment
might add accuracy without causing distortion.  It refrains from
such an analysis and applies a generalized policy not to go
behind the financial statement line items." Domestic Producers'
Comments at 5.

        [10] At issue in this determination was the failure of the
surrogate to disaggregate manufacturing and non-manufacturing
labor costs.  The surrogate was an Indian company deemed
comparable to a Chinese exporter.  Petitioner argued that
failing to disaggregate costs from different types of labor
overstated the CV of costs faced by the Chinese producer and

                              (footnote continued . . . )

decision specifically with reference to the balancing test that

the Domestic Producers claim it discarded,[11] and explained how

the then instant case differed from the HRS from Romania

determination of 2005 in ways that justified a different

outcome.[12]  Thus, based on a close examination of Free Sheet

---

resulted in a distorted estimate of SG&A costs.  The petitioner
suggested that Commerce could apply a ratio to the aggregate
labor cost figure based on data provided by the India Labor
Bureau's Annual Survey of Industries, a public source.

Commerce determined that it would not disaggregate labor
costs, relying primarily on Wooden Bedroom Furniture from the
People's Republic of China, 72 Fed. Reg. 46,957 (Dep't Commerce
Aug. 22, 2007) (amended final results) and accompanying Issues &
Decision Mem., A-570-890 ("WBF 2007 I&D Memo") at cmt. 26 as an
authority for the Department's practice: "The Department has
noted its preference for using financial statements of surrogate
companies that produce merchandise that is comparable or
identical to subject merchandise without making adjustments to
individual line items in the financial statement." Free Sheet
Paper at cmt. 4 (emphasis added).

[11] Commerce explained that a lack of information about the
surrogate and the difference between a non-market economy
("NME") producer and a market economy ("ME") surrogate made it
impossible to be certain that an adjustment to this balance
sheet item would improve accuracy: "[b]ecause [the Department]
does not know all of the components that contribute to the costs
of a surrogate producer, it cannot be certain of the individual
components which comprise the various line items in surrogate
financial statements.

"Therefore, adjusting those statements may not make them
any more accurate and indeed may only provide the illusion of
precision." Free Sheet Paper at cmt. 4.

[12] The Department addressed its prior decision to
disaggregate in  HRS from Romania and differentiated that
decision from the fact pattern in Wooden Bedroom Furniture:

"Given this extreme fact pattern [described in HRS From
Romania], the Department concluded that significant overhead
costs were missing and an adjustment needed to be made.  This
extreme situation is not present in the instant investigation as
                                    (footnote continued . . . )

Paper Determination in 2007, it is difficult to accept the
Domestic Producers' claim that this 2007 determination
establishes a new policy or rejects in principle the
disaggregation of balance sheet line items under all
circumstances.  The balancing of the need to improve accuracy
and the danger of introducing distortion was still used in this
determination, but the Department found that, given the facts
and circumstances in that case, the test justified its
preference not to go behind balance sheet line items when doing
so was not supported by adequate data on the record. Id. at cmt.
4.

      The second citation presented by the Domestic
Producers to support their claim that the Department has a
policy of never going behind financial statement line items
comes from the WBF 2011 I&D Memo.  The extended quotation from
this memo presented by the Domestic Producers, however, has a
number of problems.  First, roughly half of the quotation
provided is quoted in turn from Pure Magnesium in Granular Form
from the People's Republic of China, 66 Fed. Reg. 49,345 (Dep't
Commerce Sept. 27, 2001) (final determination) and accompanying
Issues & Decision Mem., A-570-864 ("Pure Magnesium from China")

_____

both the factory overhead and SG&A ratios used here are based on
numerous expenses." Free Sheet Paper at cmt. 4.

at cmt. 4, a determination made in 2001.[13]  It therefore appears

that the Domestic Producers are supporting a claim regarding a

new policy, alleged to come into existence in 2007, by

ultimately citing a determination written in 2001 - a time in

which the Domestic Producers admit that the Department's policy

allowed "going behind" financial statement line items.  As

significantly, Pure Magnesium from China based its decision on a

line of determinations running back to the mid-1990's that were

developed specifically to avoid distortions when the surrogate

for an NME producer was unlikely to face costs similar to those

of the ME surrogate or when differences in national accounting

systems made disaggregating costs likely to produce

distortions.[14]  In addition, Pure Magnesium from China justifies

---

[13] The omission of internal citations from the quote
provided by the Domestic Producers makes this source both
complex and misleading.  Almost all of the quote provided (from
"to not make" in the second line forward) is actually quoted
directly from Certain Coated Paper Suitable for High Quality
Print Graphics Using Sheet-Fed Presses from the People's
Republic of China, 75 Fed. Reg. 59,217  (Dep't Commerce Sept.
27, 2010) (final determination) and accompanying Issues &
Decision Memorandum, A-570-958 at cmt. 32, which is in turn
directly quoting Wooden Bedroom Furniture from the People's
Republic of China, 75 Fed. Reg. 50,992 (Dep't Commerce Aug. 18,
2010) (final results) and accompanying Issues & Decision
Memorandum, A-570-890 at cmt. 30A.  From this point, the
citation combines direct quotes from two sources, but the
ultimate origin of the statement is in Pure Magnesium from China
at cmt. 4.
   [14] In Pure Magnesium from China, Commerce applied its policy
to elements of factory overhead and subcontractors rather than
direct and indirect selling expenses.  The adjustments related
                                  (footnote continued . . . )

the Department's decision by referring to <u>Pure Magnesium from
the Russian Federation</u>, 66 Fed. Reg. 49,347 (Dep't Commerce
Sept. 27, 2001) (final determination) and accompanying Issues &
Decision Mem., A-821-813 ("<u>Pure Magnesium from Russia</u>") at cmt.
2, a determination made concurrently and on the same grounds.
In <u>Pure Magnesium from Russia</u>, the Department justified its
decision not to go behind financial statement line items as the
best way to achieve accuracy in the absence of sufficient
information; that is, when certain circumstances are present
such as a comparison between an NME producer and an ME
surrogate, the balance can be presumed to weigh against
uninformed modification of balance sheet items.[15]

---

to the fractions of labor, depreciation, and energy costs faced
by different producers.  In addition, the surrogate firm in <u>Pure
Magnesium from China</u> used a different processing technology than
the Chinese firm, leading to the difficult problem of comparing
any line item between the surrogate and target balance sheets
and making any attempt to "correct" specific line items a
necessarily subjective and arbitrary decision.  <u>See</u> <u>Pure
Magnesium from China</u> at cmt. 4 (discussion of subcontractor
costs and comparison of energy costs).  The reasons why Commerce
would be reluctant to try to correct balance sheet items in <u>Pure
Magnesium from China</u> are thus absent in the present case, which
features a comparison of the direct and indirect selling costs
faced by firms a) producing the same product, b) shipped using
the same three methods, c) using the same national accounting
standards, and d) located in the same country (which is a
designated ME).

[15] Both the limiting conditions of this policy and the fact
that it is intended to serve as a guideline in applying the
balancing test are made clear by referring to a line of
determinations going back to 1996: "[r]arely, if ever, will it
be known that there is an exact correlation between overhead
                                (footnote continued . . . )

Simply put, it appears that the Domestic Producers are correct that Commerce has articulated a practice of not going behind line items, but the Domestic Producers neglect to mention factors in the cited determinations that a) place limiting conditions on the application of that policy and b) explain the reasons why this general practice was adopted – reasons that are absent in the present case.  The policy, applied since at least 1996 and consistent with HRS from Romania in 2005, is repeatedly stated to serve the goal of balancing increasing accuracy against the danger of introducing distortions in cases where either the difference between NME and ME producers or differences between the nationality of producers would make line-by-line comparisons misleading.  Each of the Determinations cited by the Domestic Producers explain the Department's decision not to disaggregate surrogate balance sheet items in those cases with reference to this balancing test and support the decision not to disaggregate by citing either problems of

expense components of the NME producer and the components of the surrogate overhead expenses. Therefore [. . .] the Department normally bases normal value completely on factor values from a surrogate country on the premise that the actual experience in the NME cannot meaningfully be considered.  Accordingly, Department practice is to accept a valid surrogate overhead rate as wholly applicable to the NME producer in question." Pure Magnesium from Russia at cmt. 2 (citing Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the Republic of Romania, 61 Fed. Reg. 51,429 (Dep't Commerce Oct. 2, 1996) (final results) and accompanying Issues & Decision Mem., A-485-602 ("TRB from Romania") at cmt. 7.)

incommensurability or a lack of reliable data on the record.[16]

Neither of these circumstances are present in the instant case,

making the Department's application of the underlying balancing

test an appropriate exercise of discretion similar to HRS from

Romania.[17]

      Finally, the Domestic Producers cite an

acknowledgement by this court of the alleged policy in 2012. See

Dongguan Sunrise Furniture Co., Ltd. v. United States, 36 CIT

___, 865 F. Supp. 2d 1216, 1244 n.43 (2012).  Both the decision

in that case and the precedent relied upon by the court in

---

[16] See WBF 2011 I&D Memo at cmt. 19(A)(iv) ("In NME cases,
it is generally not possible for the Department to dissect the
financial statements of a surrogate company as if the surrogate
company were the respondent under review, because the
information necessary to do so is typically not available."
(emphasis added)); Coated Paper at cmt. 32 ("However, in NME
cases, it is impossible for the Department to further dissect
the financial statements of a surrogate company as if the
surrogate company were an interested party to the proceeding, as
the Department has no authority to either ask questions or
verify the information from the surrogate company." (emphasis
added)).  It is also worth noting that the Department has been
reluctant to alter line items even in market economies based on
comparison with parallel firms in other market economies,
suggesting that differing accounting conventions and business
practices across countries as well as the NME status of a
producer can raise sufficient concerns about the danger of
introducing distortions to trigger the presumption against
disaggregation.  See PET Film 2012 at Issue 1.
[17] Note that the factors that marked HRS from Romania as an
"extreme fact pattern" in Free Sheet Paper (see Note 12, supra)
are less extraordinary when examining both producers and
surrogates in the same market economy that use the same
accounting standards, produce identical products, and export to
the same markets.

reaching it, however, are clearly permissive rather than mandatory.[18]  The court acknowledged in both cases that the Department has the discretion under 19 U.S.C. § 1677b(c)(4) to refrain from disaggregating balance sheet line items when there was significant uncertainty that disaggregation would produce more accuracy.

Based on this examination of the determinations cited by the Domestic Producers, a better understanding of the Department's policy emerges.  At least since the 1996 TRB from Romania Determination, the Department has developed a preference for accepting surrogate balance sheet items in toto for three reasons.  First, the difficulty of comparing the costs facing ME and NME producers in detail made it unlikely that correcting individual surrogate balance sheet items would improve accuracy

---

[18] The governing precedent cited in Dongguan Sunrise is Magnesium Corp. of Am. v. United States, 166 F.3d 1364, 1372 (Fed. Cir. 1999).  This case finds that "[g]iven [several listed] uncertainties, the broad statutory mandate directing Commerce to use, 'to the extent possible,' the prices or costs of factors of production in a comparable market economy country does not require item-by-item accounting [. . .]."  It is not reasonable to read this as requiring that the Department refrain from item-by-item accounting when better data is available on the record and doing so is unlikely to introduce distortions. The court in Dongguan Sunrise affirms the permissive interpretation of this decision. 865 F. Supp. 2d 1216 at 1244 n.43 ("Commerce is not required to do a line-by-line analysis [. . .]"(emphasis added)).

and highly likely that they would introduce distortion.[19]

Second, different national accounting standards and production

processes made it likely that introducing corrections based on

surrogates in other countries would introduce distortions.[20]

Third, the inability to gather detailed information about non-

party surrogates in third countries meant that disaggregation of

balance sheet line items would likely be based on incomplete

information.[21]

Applying these criteria to the present case supports

the Department's position.  First and most obvious, the

Department's policy against disaggregation is intended to apply

in NME cases where a CV is being calculated based on a surrogate

producer in a third country.  Landblue does not present such a

---

[19] The inherent problems of creating a record that favored
disaggregating balance sheets for NME producers using market
economy surrogates were emphasized in Magnesium Corp. of Am. v.
United States, 20 CIT 1092, 1104 (1996), aff'd 166 F.3d 1364 at
1372. ("There is no evidence on the record that MagCorp's method
of allocating inventory better reflects the subject NME country
realities [. . .]").

[20] See, e.g., PET Film 2012 at Issue 1 (determining that
incompatibilities between national accounting standards in the
Philippines and Thailand were more important than possible
distortions through subsidies in determining which country to
use as a surrogate); Coated Paper at cmt. 32 (distinguishing
that case from Woven Electric Blankets from the People's
Republic of China, 75 Fed. Reg. 38,459 (Dep't Commerce Jul. 2,
2010) (final determination) and accompanying Issues & Decision
Mem., A-570-951 at cmt. 4, on the basis of whether surrogate
financial statements were sufficiently detailed to allow exact
classification of costs).

[21] See Coated Paper at cmt. 32.

case, as both Thantawan and TPBI are, like Landblue, operating in the same market economy.  Second, the policy is intended to guard against the uncertainties that arise when comparing producers operating in different national environments where accounting standards, industry norms, or other factors increase the danger of introducing distortions by attempting to "correct" balance sheet items.  These dangers are absent here; the record shows that both the respondent and the surrogate are Thai producers operating in the same economic environment and producing similar products for similar markets.  Only the third criterion – the problem of gathering record evidence directly from the surrogate – would weigh against disaggregation.[22]

Based on this, the Department here has adequately justified the application of its longstanding balancing test between improving accuracy and the danger of introducing distortion in this case.  The policy articulated in HRS from Romania in 2005 was not discarded or superseded in Free Sheet Paper, but distinguished by the Department on the grounds noted above.  The Determinations cited by the Domestic Producers do not demonstrate that a new policy was introduced in 2007.  The Department's "determination based upon the facts unique to each case, and pursuant to a consistent goal" of balancing the

---

[22] See Id. at Comment 32.

possibility of increasing accuracy against the danger of introducing distortion is therefore neither arbitrary nor inconsistent. Remand Results at 18.  Accordingly, the Department's decision to disaggregate Thantawan's reported selling expenses based on the ratio derived from TPBI's direct to indirect expenses to calculate a CV for Landblue is affirmed.

C. Profit

Finally, the Department's remand determination declined to reopen its choice of an appropriate surrogate amount for Landblue's profit.  Nothing in the TPBI Remand Order required it to do so.  Rather that remand order specifically affirmed Commerce's determination on this issue.

### CONCLUSION

For the foregoing reasons, the Department's determinations in response to the remand are affirmed.  Judgment shall be entered accordingly.

/s/  Donald C. Pogue
Donald C. Pogue, Chief Judge

Dated: November 13, 2013
       New York, NY